■ MARK TORKEL, Respondent, v NYU HOSPITALS CENTER et al., Appellants. (And a Third-Party Action.) [883 NYS2d 8]—

Order, Supreme Court, New York County (Debra A. James, J.), entered September 11, 2008, which denied defendants' motion for summary judgment dismissing the complaint (except as to plaintiff's claim under Labor Law § 241 [6] based on Industrial Code [12 NYCRR] § 23-2.1 [b]) and, upon a search of the record, granted summary judgment in favor of plaintiff on the issue of liability under Labor Law § 240 (1), modified, on the law, to the extent of dismissing plaintiff's claims under Labor Law § 240 (1) and § 241 (6), and otherwise affirmed, without costs.

Plaintiff was employed by third-party defendant Rite-Way Internal Removal, Inc. (Rite-Way), which had been engaged as a subcontractor by defendant HRH Construction (HRH) to haul debris away from a work site on the ground floor of a medical school building where a new magnetic resonance imaging research facility was being installed. HRH was employed as the general contractor and construction manager on the project, defendant New York University (NYU) owns the premises, and the other defendants are NYU affiliates. The construction agreement between NYU and HRH required the latter to hire subcontractors to perform the work, which included keeping the work site "free at all times from unreasonable accumulation of waste material or rubbish" caused by the project. A June 2002 transmittal letter from HRH to defendant NYU Hospitals Center indicates that HRH had contracted with Rite-Way to perform "[d]emolition" work on the project, and other correspondence from HRH to Rite-Way reflects HRH's intent to award Rite-Way a contract for the work. A form of contract for the work by Rite-Way is also included in the record.

The construction debris from the project was removed from the site and taken to the street in Rite-Way's wheeled containers, which typically held about 250 pounds of material. HRH employees, with plaintiff's regular help, loaded the containers. Rite-Way employees would haul the debris away by truck about once a day, sometimes after an HRH employee had called and requested a pickup. The Rite-Way employees would drive a truck to the work site and, using a winch affixed to the truck, raise the containers and dump the debris into it.

On March 19, 2004, plaintiff, who had been sent to the work site by Rite-Way dispatchers, was injured while rolling a filled container from the work site to his truck parked on the street. When plaintiff arrived, he observed that a three-quarter-inch-thick sheet of plywood had been laid down as a makeshift ramp to bridge the gap in height between the edge of the work site, at curb level, and the street, which was lower than usual because the surface layer of asphalt had been removed during ongoing repaving. The plywood was not braced or supported from beneath. Plaintiff stated that the height differential between the bridged levels was "[a]nywhere between 12 and 18 inches, give or take a few." While plaintiff was maneuvering the container down the plywood ramp, the ramp collapsed, causing the container to spill concrete debris onto plaintiff's leg and fall over onto the sidewalk. Plaintiff was injured while trying to regain control of the container and keep it from tipping over.

Upon defendants' motion for summary judgment, the motion

court searched the record and granted summary judgment to plaintiff as to liability under Labor Law § 240 (1), and denied summary judgment to defendants with respect to the claims under Labor Law §§ 200 and 241 (6), to the extent the latter were based on Industrial Code (12 NYCRR) § 23-1.7 (f) and § 23-1.22 (b) (2). The court granted summary judgment to defendants with respect to plaintiff's claim based on Industrial Code § 23-2.1 (b) and denied it with respect to the Labor Law § 200 and common-law negligence claims.

Labor Law § 240 (1) provides in relevant part: "All contractors and owners and their agents . . . in the . . . demolition [or] altering . . . of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed." Section 240 (1) imposes absolute liability on owners, contractors and their agents for injury proximately caused by a breach of the statutory duty (*Gordon v Eastern Ry. Supply*, 82 NY2d 555, 559 [1993]). The hazards that warrant the protection contemplated by the statute are "those related to the effects of gravity where protective devices are called for . . . because of a difference between the elevation level of the required work and a lower level" (*Rocovich v Consolidated Edison Co.*, 78 NY2d 509, 514 [1991]).

As a threshold matter, the only argument defendants made to the motion court for dismissing the section 240 (1) claim is that plaintiff was not exposed to the type of elevation-related hazard contemplated by the statute. However, in its order, the court stated that "[w]ith respect to plaintiff's Labor Law 240 claim defendants argue that the plaintiff was not engaged in an activity requiring protection. Defendants' argument is meritless. Defendants' foreman stated that plaintiff regularly assisted in moving the carts from the building to the truck. This work was carried out as part of a construction contract between defendants including the third-party defendant, plaintiff's employer. Defendants also do not deny that a ramp was necessary to move the carts between the height differential of the loading dock, the curb and the street although that differential was only over one foot high due to construction occurring on the roadway and sidewalk. Therefore, defendants were required to provide appropriate safety devices." Here the court not only addressed and rejected defendants' argument that plaintiff was not exposed to an elevation-related hazard, but also raised new matter sua sponte. The court's findings that plaintiff moved containers

from the building to the truck and that he performed his work pursuant to a contract between defendants, including his employer, have no bearing on whether his work presented an elevation-related hazard, which was the only argument before the court with respect to whether plaintiff was "engaged in an activity requiring protection" under section 240 (1).

On appeal, defendants contend for the first time that the statute is inapplicable because plaintiff was not engaged in any of the enumerated activities set forth in the statute or in work that was "incidental and necessary" to the performance of those activities. Whatever its merit, this new argument is not properly before this Court because defendants' failure to raise it before the motion court deprived plaintiff of the opportunity to submit evidence with which to refute it (*see e.g. Douglas Elliman-Gibbons & Ives v Kellerman*, 172 AD2d 307, 308 [1991], *lv denied* 78 NY2d 856 [1991]).

However, given that the bottom of the ramp was resting on the street and the top was resting on the adjacent sidewalk curb, and the height differential from the bottom to the top was at most 12 to 18 inches, we agree with defendants that plaintiff was not exposed to an elevation-related hazard as contemplated by section 240 (1) (*see DeStefano v Amtad N.Y.*, 269 AD2d 229 [2000] [ramp rising 12 inches from ground to building entrance did not present an elevation-related hazard]; *DeMayo v 1000 N. of N.Y. Co.*, 246 AD2d 506 [1998] [13-inch-high step from ground to shanty entrance not an elevation-related hazard]; *cf. Arrasti v HRH Constr. LLC*, 60 AD3d 582 [2009] [section 240 (1) claim stated where plaintiff fell from ramp connecting concrete floor with hoist platform constructed about 18 inches above floor]).

Plaintiff's Labor Law § 241 (6) claims predicated on Industrial Code (12 NYCRR) § 23-1.7 (f) and § 23-1.22 (b) should have been dismissed. Section 23-1.7 (f) applies to stairways, ramps and runways used "as the means of access to working levels above or below ground." The ramp in this case, which bridged the height differential between a sidewalk curb and the adjacent road surface, did not provide access to an above- or below-ground working area within the meaning of the regulation.

We note that defendants' only argument to the motion court with respect to the section 23-1.7 (f) claim was that they did not supply the ramp. However, since there is no dispute about how the ramp was used, the question whether section 23-1.7 (f) applies presents an issue of law that is properly before this Court (*Buywise Holding, LLC v Harris*, 31 AD3d 681, 682 [2006]; *see also Anderson v Carduner*, 279 AD2d 369, 370 [2001]).

Section 23-1.22 (b) applies to ramps used by "motor trucks or

heavier vehicles," "wheelbarrows, power buggies, hand carts or hand trucks" or by "persons only." The use of the ramp in question as a means for workers to move wheeled dumpsters does not fall within the regulation's enumerated categories.

To support a finding of liability under Labor Law § 200, which codifies the common-law duty of an owner or general contractor to provide a safe work site (*see Perrino v Entergy Nuclear Indian Point 3, LLC*, 48 AD3d 229 [2008]), a plaintiff must show that the defendant supervised and controlled the plaintiff's work, or had actual or constructive knowledge of the alleged unsafe condition in an area over which it had supervision or control, or created the unsafe condition (*see Espinosa v Azure Holdings II, LP*, 58 AD3d 287, 290-291 [2008]; *Lane v Fratello Constr. Co.*, 52 AD3d 575, 576 [2008]; *Hernandez v Columbus Ctr., LLC*, 50 AD3d 597, 598 [2008]; *Griffin v New York City Tr. Auth.*, 16 AD3d 202, 202-203 [2005]; *Murphy v Columbia Univ.*, 4 AD3d 200, 201-202 [2004]).

Defendants argue that they cannot be liable under section 200 because plaintiff failed to show that they supervised or controlled his work. As evidence of control, however, plaintiff submitted testimony from an HRH foreman that HRH was responsible for moving the containers to the Rite-Way trucks parked on the street and that sometimes plaintiff and other Rite-Way employees moved the containers because "basically we're trying to help each other." This testimony, when coupled with HRH's contractual obligation to have rubbish removed from the project site, creates an issue of fact as to control.

In addition, plaintiff made a prima facie showing that HRH was responsible for or was aware of the dangerous condition. The NYU defendants failed to meet their initial burden on the summary judgment motion by showing lack of responsibility or awareness.

Contrary to the dissent's assertion that plaintiff offers "no evidence as to how the piece of plywood came to be placed where it was," the HRH foreman testified that (1) the ramps used to move the containers to the street were made of "whatever you can find to use," (2) the ramp that caused the accident was made of plywood that "was probably taken out of one of the dumpsters" at the site, (3) during the four- or five-day period between the time the top surface of the roadway was stripped (making a ramp necessary to move the containers from the curb to the street) and plaintiff's accident, the foreman alone moved the containers to the trucks, and (4) to move the containers, "[y]ou find a piece of plywood, piece of steel, piece of tin and you put it on the curb." These statements, coupled with

plaintiff's testimony that the ramp was in place when he arrived, could lead a finder of fact reasonably to conclude that it was more likely than not that someone under defendants' control laid down the plywood and thereby created the dangerous condition. Concur—Moskowitz, Renwick and Freedman, JJ.

Andrias, J.P., and Nardelli, J., concur in part and dissent in part in a separate memorandum by Andrias, J.P., as follows: In this action to recover for personal injuries suffered by plaintiff on March 19, 2004 as he was using a roughly three-foot-by-two-to-four-foot piece of three-quarter-inch plywood as a makeshift ramp to push a minicontainer of construction debris from the freight entrance of a building at 660 First Avenue in Manhattan to his refuse removal truck, we all agree that defendants are entitled to summary judgment dismissing plaintiff's causes of action alleging violations of Labor Law § 240 (1) and § 241 (6). However, I would dismiss those causes of action for additional reasons, and I therefore concur separately. Because plaintiff also failed to present evidence sufficient to raise a question of fact regarding his Labor Law § 200 and common-law negligence causes of action, I dissent from the majority's sustaining of those causes of action and would reverse and grant defendants' motion in its entirety and dismiss the complaint.

While there are some differences in the testimony of the only two fact witnesses, plaintiff and defendant HRH Construction's laborer foreman Arthur Covelli, all parties agree that the operative facts, which derive from their testimony, are not in dispute. At the time of the accident, plaintiff was a driver for third-party defendant Rite-Way Internal Removal, Inc., and his job on the day in question was to pick up minicontainers filled with construction debris at various locations. Covelli, whom plaintiff knew only as "Artie," was in charge of collecting the debris, putting it in the minicontainers provided by Rite-Way, and placing the minicontainers out on the sidewalk to be picked up.

According to plaintiff, no one other than the Rite-Way dispatcher directed, supervised or controlled his activities on a daily basis. On the morning in question, he was given a route sheet by his dispatcher listing the locations at which he was to make pickups that day. One of these was 660 First Avenue, where HRH was the general contractor and construction manager of a project for the complete renovation of 2,700 square feet of the ground floor, including the Emergency Department of Radiology at the NYU Medical Center. Rite-Way was not performing any work at 660 First Avenue. Plaintiff was there simply to pick up dumpsters.

Plaintiff testified at one point that when he first arrived at

the site there were full containers of construction debris already outside the freight entrance at 660 First Avenue. However, at another point he testified that when he arrived at the site he did not find dumpsters already outside the building.

Plaintiff gave the following account of his accident:

"I went to where the containers were by the freight area. I went to push a container, a mini, half yard mini container overloaded of [sic] concrete to the truck, and I went down a makeshift plywood ramp and the plywood ramp gave way.

"I tried to hold the container up and I couldn't since it was too heavy and that's how my injury occurred."

The exact location of the piece of plywood and the height differential between the top and the bottom are not entirely clear. Again, however, any differences in the witnesses' testimony have no legal significance.

Plaintiff testified that when he arrived at the site he double-parked his truck in front of a "cut sidewalk . . . [f]or a driveway" about 25 to 50 feet from the freight entrance and got out. He then walked to the freight entrance, grabbed a container and pushed it outside. He had no problem pushing the container to the piece of plywood, but as he pushed the overloaded container down it the plywood "buckled. You heard it cracked [sic]." As the container tipped over on the sidewalk, either it or some of its contents grazed plaintiff's right leg, causing him to twist his leg. Thus far, no one from HRH had been present or had spoken to him. Plaintiff testified that, after Covelli arrived at the scene, they and two other men who were working across the street for either Consolidated Edison or the Department of Environmental Protection righted the dumpster. Covelli then wheeled it over to the truck, and plaintiff hooked up two chains and a winch cable and dumped the contents into the truck.

According to Covelli, his duties at HRH's job site were "general housekeeping." ("I have to maintain the site so there's no tripping hazard, rubbish on the floor for fire, rodents. And removal of all the rubbish that's on the floor.") He also testified that his duties were limited to the inside of the building. ("Inside the building I am responsible for, outside the building I am not responsible. If there is a sign from the telephone people or bus stop I'm not responsible for that. But inside the building, yes.") Covelli testified that, at about 9:00 or 10:00 A.M. on the day in question, he filled up six or seven minicontainers with construction debris, moved them from the work site and lined them up on the sidewalk up against the building, where they waited to be picked up. Sometime later that morning, Rite-

Way's dispatcher radioed him while he was in the building's basement and told him that the truck was outside to pick up the containers. ("Usually they blow the horn on the truck and you can come down to the street. I happened to be in the basement. They usually reached me by radio.") Covelli told the dispatcher he would be right up and went up to the street, where he saw plaintiff in the middle of the driveway, sitting on an overturned container. Plaintiff told him that he thought he had hurt his knee. Covelli then helped plaintiff right the container and pick up the spilled debris. They dumped the rest of the containers into the Rite-Way truck, and plaintiff drove off.

The minicontainers, which contained approximately 250 pounds of debris, were usually lined up near the freight entrance and were pushed 15 feet along the "very smooth" sidewalk to a driveway where plaintiff had parked his truck. Normally the containers were simply pushed down the driveway into the street without assistance because there was about a two-to-four-inch differential between the street and the steel curb of the driveway apron. However, because Con Edison had stripped the asphalt from the street down to the concrete four or five days earlier, prior to repaving it, there was a six-to-eight-inch differential between the steel curb and the surface of the street. As a result, for the four or five days preceding plaintiff's accident, Covelli used a piece of plywood, steel or tin as a makeshift ramp to facilitate pushing the minicontainers down the driveway to street level, where they were hooked up to a winch by a Rite-Way employee, who emptied the contents into the truck. After all the containers were emptied, the makeshift ramp would be picked up and thrown into the back of the truck to be discarded.

The containers were picked up on a daily basis by various Rite-Way drivers. Sometimes the driver would help Covelli push the containers to the truck; sometimes he would not help.

"It's basically we're trying to help each other. I want the containers emptied and they want to get to their next stop. So we try and help each other. We push the container to the truck, we help him that way and then he dumps it and tries to get it done as quick as he can.

"Q. So it wouldn't be out of the ordinary for them to pull the full dumpster toward the truck to assist in the dumping?

"A. That's correct. It's done every day."

According to Covelli, plaintiff's duties were to operate the truck and dump the contents of the container into the back of the truck. "When he arrives on the job site, we're supposed to bring the containers to the truck, we help him hook them up to

the truck because there are some cables. He operates the truck which dumps the container with the rubbish in it . . . [W]hen he is done he will remove the cables and he is finished." When asked if before the accident he ever told plaintiff not to help with the dumpsters, he replied, "No, sir." He also testified that Rite-Way had no employees who actually worked in the building and that Rite-Way employees were there solely to pick up rubbish. Usually HRH employees took the containers to the truck but "[s]ometimes" plaintiff also took containers to the truck.

HRH, and the NYU defendants, the owner of the premises, moved for summary judgment dismissing the complaint on the ground that there is no evidence that plaintiff's accident resulted from the effects of gravity as required by Labor Law § 240 (1); that no liability can attach under Labor Law § 200 because there is no evidence that HRH or the NYU defendants supervised or controlled plaintiff's activities at the time of the accident; that the Industrial Code sections underlying plaintiff's Labor Law § 241 (6) claim are inapplicable to the facts of this case; and, that if plaintiff's Labor Law claims are dismissed, his common-law negligence claims should also be dismissed, because there is no evidence that defendants caused his accident.

As in all summary judgment motions, once the movants establish prima facie entitlement to judgment as a matter of law, the burden shifts to the opposing party to present sufficient evidence either to raise a substantial question of fact warranting a trial or to establish its entitlement to judgment as a matter of law. Therefore, since in his opposition plaintiff agreed that there is no dispute as to the relevant facts, the issue for the motion court to decide was whether the agreed-upon facts were sufficient to impose liability upon defendants as a matter of law.

As to his Labor Law § 240 (1) claim, plaintiff argued, in pertinent part, that the piece of plywood failed to give him proper protection in the task of wheeling the container over a significant height gap of 12 to 18 inches, as shown by the fact that it collapsed while in use and caused his injuries. In support of his Labor Law § 200 claim, plaintiff's sole argument was that defendants presented no evidence that they did not control his work since they failed to proffer any contract or witness in support of their claim that plaintiff acted without their control when he used the makeshift ramp. As to his Labor Law § 241 (6) claim, plaintiff offered an affidavit by his safety expert opining that defendants violated Industrial Code (12 NYCRR) §§ 23-2.1, 23-1.22 and 23-1.7 (f).

The motion court denied defendants' motion and, upon searching the record, granted plaintiff summary judgment on

his Labor Law § 240 (1) claim, based upon his uncontradicted testimony that the plywood ramp gave way. Citing *McCann v Central Synagogue* (280 AD2d 298, 299-300 [2001]), the motion court reasoned that defendants were liable under any interpretation of the facts, that is, if they provided the plywood, then the statute is violated because of a defective safety device, and, if they failed to provide the plywood, then that failure is also a violation of the statute. As to plaintiff's Labor Law § 200 claim, the court found that Covelli's testimony "that when plaintiff assisted in moving the carts the foreman did not stop him from doing so . . . creates an issue of fact as to the defendants' control over the plaintiff's work as plaintiff's actions were performed in full view of the testifying foreman who also assisted plaintiff in moving the carts." The court also found that Industrial Code (12 NYCRR) § 23-1.7 (f) and § 23-1.22 (b) are sufficiently specific to support liability under Labor Law § 241 (6).

Defendants appeal, and argue that plaintiff was not performing a protected activity since he was merely at the site to pick up debris; that the piece of plywood cannot be called an "elevated work surface" since none of the safety devices enumerated in section 240 (1) could have been used on the plywood to allow plaintiff to perform the work more safely; and that plaintiff was not injured when he fell from a height or when a load being hoisted above him fell upon him but was struck by an object at the same height as the one he was working on. They further argue that the alleged Industrial Code violations are not applicable to the facts of this case since plaintiff was not using the plywood as a means of accessing any working levels above or below ground at the site and that plaintiff has failed to present any evidence that defendants exercised any degree of actual supervision or control over the work being performed at the time of the accident.

As to his section 240 (1) claim, plaintiff responds that the motion court properly concluded that the collapse of a makeshift ramp bridging a gap of 12 to 18 inches constitutes a violation of the statute, based on Covelli's testimony that a ramp was needed at the drop where the driveway curb met the roadway. He also argues that defendants fail to even mention *McCann v Central Synagogue* (280 AD2d 298, 299-300 [2001]) or *Conklin v Triborough Bridge & Tunnel Auth.* (49 AD3d 320, 321 [2008]), relied upon by the motion court, and that their claim that removing construction debris from a work site is not a protected activity under Labor Law § 240 (1) is being raised for the first time on appeal and is contrary to this Court's decision in *Rivera*

*v Squibb Corp.* (184 AD2d 239 [1992]). Plaintiff further argues that there is ample evidence supporting his Labor Law § 241 (6) claim and that Covelli's testimony establishes that HRH controlled the work of moving the dumpsters and created the dangerous condition by allowing the use of the unsecured plywood as a ramp, in violation of Labor Law § 200.

Plaintiff relies heavily on this Court's decision in *Rivera* for the proposition that removing debris is an integral part of a construction project. However, all the relevant facts are not set forth in our memorandum decision in *Rivera*. An examination of the appellate record demonstrates, as discussed below, that the relevant facts in that case are readily distinguishable.

In avoiding any discussion of *Rivera*, which is extensively briefed by the parties, the majority adopts plaintiff's argument that defendants' claim that removing construction debris from a work site is not a protected activity under Labor Law § 240 (1) is raised for the first time on appeal. However, this conclusion is belied not only by the motion court's decision, which specifically notes that "[w]ith respect to plaintiff's Labor Law 240 claim defendants argue that the plaintiff was not engaged in an activity requiring protection," but also by the parties' appellate briefs, which frame the primary issue presented as whether plaintiff was engaged in a protected activity under Labor Law § 240 (1) at the time of his accident. There is nothing in the motion court's decision or in the record to support the majority's conclusion that the motion court "raised new matter sua sponte" or in any way did not decide the issues as presented by the parties. Clearly, the question of whether plaintiff was engaged in work covered by section 240 was raised and decided below. Nevertheless, although it declines to reach that argument, the majority rejects plaintiff's Labor Law § 240 (1) claim on other grounds.

In *Rivera* (184 AD2d 239 [1992]), an employee of a subcontractor performing demolition work on the 25th through 27th floors of an office building was assigned to help a fellow employee empty the contents of 14 dumpsters into their employer's garbage truck. To do so, the truck was equipped with a mechanism to which the loaded dumpsters were attached by a metal rod and then hoisted and their contents dumped into the garbage truck. The containers were located on the loading dock on the ground floor of the building. The accident occurred when debris became stuck in one of the containers that was being hoisted. Plaintiff attempted to loosen the debris and had his arms inside the container when his coworker pulled the lever to activate the hoist. Plaintiff was lifted off the ground with the

container until his coworker realized the problem and stopped the hoist and brought it back down. In the process, plaintiff fell to the ground and was injured.

First, unlike the plaintiff here, Rivera was an employee of the demolition subcontractor that was actually performing the demolition work in the building at the time of the accident and thus was a member of a team within the meaning of *Prats v Port Auth. of N.Y. & N.J.* (100 NY2d 878, 882 [2003]). As the court stated in *Prats*, explaining *Martinez v City of New York* (93 NY2d 322 [1999]), where there are separate, sequential phases in a particular project, involving different employees working for different contractors, work being performed during "a separate phase easily distinguishable from other parts of the larger construction project" may therefore fall outside the protection of Labor Law § 240 (100 NY2d at 881). In *Prats*, the plaintiff, an assistant mechanic employed by the air-conditioning contractor, was hit by a falling ladder on which his coworker was inspecting an air-conditioning return fan. The Court held that such inspections fell within the purview of Labor Law § 240 (1) because they "were ongoing and contemporaneous with the other work that formed part of a single contract" (100 NY2d at 881).

Here, on the other hand, the record is clear that, at the time of plaintiff's accident, plaintiff's employer, Rite-Way, was not hired to perform any demolition work on the premises, and the work being performed by plaintiff fell into "a separate phase easily distinguishable from other parts of the larger construction project." Plaintiff was not a person "employed" to carry out any demolition work and was there merely to pick up garbage. Thus, unlike the plaintiffs in *Rivera* and *Prats*, he was not within the class of workers that Labor Law §§ 200, 240 and 241 were enacted to protect and cannot invoke these provisions as a basis for recovery (*see Martinez*, 93 NY2d at 326; *Gibson v Worthington Div. of McGraw-Edison Co.*, 78 NY2d 1108, 1109-1110 [1991]).

Among the issues presented in *Rivera* was whether Labor Law § 200 applied, given the fact that the injuries occurred away from the actual demolition work site. In affirming the denial of summary judgment to defendants, this Court found that the debris removal process was part of the construction job site and was accorded the protections of the Labor Law (184 AD2d at 240). Although not specifically spelled out, this conclusion necessarily implicated Labor Law § 200 (1), which requires owners and general contractors to provide construction site workers with a safe place to work and mandates that "[a]ll

machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons," i.e., "persons employed therein or lawfully frequenting such places." The plaintiff in *Rivera* alleged that the hoisting mechanism was not properly operated. This Court also found that there was a question of fact whether there was a violation of Labor Law § 240 (1), which was clearly applicable since plaintiff, an employee of the subcontractor that was actually doing the demolition work at the time of the accident, was injured in the process of hoisting the dumpster into the truck. Here, there was no hoisting involved, and plaintiff was merely pushing the minicontainer when it overturned.

Thus, although the intent of section 240 (1) is to protect workers employed in the acts enumerated in the statute (here, construction), "even while performing duties ancillary to those acts," there is absolutely no evidence that plaintiff was a "member of a team that undertook an enumerated activity under a construction contract" (*Prats*, 100 NY2d at 882). Nor was he employed by defendant HRH, the general contractor, or any subcontractor actively working on the project. Rather, he was simply picking up debris that HRH employees put in Rite-Way's minicontainers to be emptied by plaintiff into Rite-Way's truck.

Moreover, although removal of debris may be a necessary part of any construction or demolition process, "the question whether a particular [activity (e.g., an inspection or, as in this case, removal of debris)] falls within section 240 (1) must be determined on a case-by-case basis, depending on the context of the work" (*Prats*, 100 NY2d at 883). In *Prats*, the Court found that a confluence of factors brought the plaintiff's activity within the statute: his position as a mechanic who routinely undertook an enumerated activity, his employment with a company engaged under a contract to carry out an enumerated activity, and his participation in an enumerated activity during the specific project and at the same site where the injury occurred (*id.*). None of these factors is present in this case. As this Court noted in *Adair v Bestek Light. & Staging Corp.* (298 AD2d 153, 153 [2002]), "[t]he Court of Appeals, in holding that 'the task in which an injured employee was engaged must have been performed during "the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure" ' in order to fall within the statute (*Martinez v City of New York*, 93 NY2d 322, 326), has expressly rejected an 'integral and necessary' test as 'improperly enlarg[ing] the reach of the statute be-

yond its clear terms' (*id.*)." Clearly, at the time of the accident, plaintiff was not participating in an activity enumerated in Labor Law § 240 (1).

Even assuming arguendo that plaintiff was engaged in an enumerated activity, it is well settled that the "special hazards" against which the Legislature intended to protect workers under Labor Law § 240 are limited to such specific gravity-related accidents as falling from a height or being struck by a falling object that was improperly hoisted or inadequately secured (*see Ross v Curtis-Palmer Hydro-Elec. Co.*, 81 NY2d 494, 500-501 [1993]). While there is no "bright-line" test regarding height differentials (*see Thompson v St. Charles Condominiums*, 303 AD2d 152, 154 [2003], *lv dismissed* 100 NY2d 556 [2003]), height differentials are significant in determining whether the work being done required the use of "scaffold[s], hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, [or] ropes" (Labor Law § 240 [1]). Here, the work required no such protective devices.

Viewing the evidence in the light most favorable to plaintiff, the record establishes that (1) he was not part of a "team" involved in an activity requiring protection; (2) he was never supervised or directed by HRH or NYU in his work; and (3) rather than wait for an HRH employee, he undertook to push the minicontainer to his truck using a piece of plywood that was already in place as a makeshift ramp to make it easier to push the minicontainer to street level. There is absolutely no evidence as to how the piece of plywood came to be placed where it was.

Nevertheless, citing *Conklin v Triborough Bridge & Tunnel Auth.* (49 AD3d 320, 321 [2008], *supra*), the motion court found that since defendants did not deny that the makeshift ramp was necessary to move the minicontainers through the height differentials of the loading dock, the curb and the street, they were required to provide appropriate safety devices. However, *Conklin* is readily distinguishable in that the so-called ramp or "chicken ladder" in that case consisted of two 10- or 12-foot-long planks with two-by-fours nailed across the planks at approximately 20-inch intervals, to act as rungs or crosspieces, and was laid on a 45-degree slope to provide the sole means of access to the plaintiff's employer's shanty. To access the shanty, the worker first had to climb down an aluminum ladder backwards, turn or zigzag at its base, and then go forward eight feet down the chicken ladder to the shanty. Clearly, not only the height differential involved, but also its use as the functional equivalent of a ladder, a device enumerated in the statute,

brought the chicken ladder within the ambit of Labor Law § 240 (*Ryan v Morse Diesel*, 98 AD2d 615, 615-616 [1983] ["The rule of noscitur a sociis limits the construction of the 'other devices' of the statute to the company of the specific words preceding it . . . (i.e.,) a scaffold, hoist, stay, ladder, sling, hanger, block, pulley, brace, iron or rope"]), and this Court found that defendants' failure to equip the chicken ladder with a handrail or other safety device was the proximate cause of the plaintiff's injuries.

Here, on the other hand, whether accepting plaintiff's or Covelli's description, the height differential between the top end and bottom end of the piece of plywood was, at most, 18 inches. Such height differentials have been found insufficient to implicate Labor Law § 240 (*see e.g. DeStefano v Amtad N.Y.*, 269 AD2d 229 [2000] [no cause of action under Labor Law § 240 (1) since the ramp that was positioned at building entrance and rose to a maximum of 12 inches did not present elevation hazard]). Indeed, where, as here, a plank, was used as a temporary passageway or stairway, as opposed to the functional equivalent of a device enumerated in the statute, section 240 (1) has been held not to apply (*see Paul v Ryan Homes*, 5 AD3d 58, 60-61 [2004]).

As noted above, the motion court, citing *McCann v Central Synagogue* (280 AD2d 298, 299-300 [2001]), nevertheless reasoned that defendants were liable under any interpretation of the facts. However, in *McCann*, the plaintiff was pushing a bin filled with debris up an unbarricaded wooden ramp four to eight feet high when he fell. This Court found that the issue was not whether the ramp itself was a safety device but whether it was constructed and maintained with adequate safety devices, such as railings or safety curbs.

As to plaintiff's Labor Law § 241 (6) claim, the sections of the Industrial Code he relies upon are not applicable to the facts of his case. While plaintiff argues that the piece of plywood in issue did not meet the two-inch thickness requirement in Industrial Code (12 NYCRR) § 23-1.22 (b), the piece of plywood is not the type of ramp, runway or platform contemplated by that section. Moreover, Industrial Code § 23-1.7 (f), entitled *"Vertical passage,"* merely provides that "[s]tairways, ramps or runways shall be provided as the means of access to working levels above or below ground except where the nature or the progress of the work prevents their installation in which case *ladders or other safe means of access shall be provided"* (emphasis added). Clearly, the ramps, stairways or runways contemplated by the statute are of such a nature that, in their absence, a ladder would be necessary to access different work-

ing levels (*compare Lelek v Verizon N.Y., Inc.*, 54 AD3d 583, 584-585 [2008] [failure to provide safe access from highway overpass to wooden deck three feet below]; *Conklin*, 49 AD3d at 321 [10-to-12-foot "chicken ladder" laid on 45-degree slope as sole means of access to employer's shanty]; *Miano v Skyline New Homes Corp.*, 37 AD3d 563, 565 [2007] [failure to provide safe means of access to basement apartment of newly constructed house]). Here, there is no claim, and there is no basis in the record for any claim, that plaintiff's activities required a means of access to another working level within the meaning of Industrial Code § 23-1.7 (f) (*see Lavore v Kir Munsey Park 020, LLC*, 40 AD3d 711, 713 [2007], *lv denied* 10 NY3d 701 [2008] [utility bin on side of truck not a working level above ground requiring a stairway, ramp, or runway under that section]).

That leaves only plaintiff's Labor Law § 200 and common-law negligence claims.

With regard to these claims, the majority rightly asserts that, to support a finding of liability, plaintiff must show that defendants supervised or controlled plaintiff's work or had actual or constructive knowledge of the alleged unsafe condition in an area over which they had supervision or control, or created the unsafe condition (*Griffin v New York City Tr. Auth.*, 16 AD3d 202, 202-203 [2005]). Curiously, however, although the majority finds that the fact that plaintiff was performing his work pursuant to a contract between HRH and Rite-Way has no bearing on his Labor Law § 240 (1) claim, it nevertheless finds, with regard to his Labor Law § 200 claim, that Covelli's testimony that he was responsible for moving the containers to the Rite-Way trucks parked on the street and that "sometimes" plaintiff and other Rite-Way employees moved the containers (because "basically we're trying to help each other"), "when coupled with HRH's contractual obligation to have rubbish removed from the project site, creates an issue of fact as to control." I disagree.

While there is a February 11, 2002 subcontract in the record calling for Rite-Way to perform $13,500 in demolition work for NYU's Emergency Department radiology renovation project, neither the parties nor the motion court allude to it and there is no evidence that such demolition work was being performed more than two years later on March 19, 2004, the date of plaintiff's accident. In fact, both plaintiff and Covelli testified at their depositions that on the day of the accident Rite-Way was not performing any work at that location and that plaintiff was there simply to pick up dumpsters.

Any argument that the parties' conduct, i.e., cooperating in

the removal of the construction debris, evidences a contractual relationship that supports a finding that plaintiff's activity was protected is not only unpersuasive, but also is not raised by plaintiff on appeal. Plaintiff's only arguments on appeal with regard to his Labor Law § 200 claim are that the motion court correctly found that issues of fact were presented since defendants "proffered neither a contract nor a witness to describe the NYU Defendants' contractual roles," and that Covelli testified that he had a practice of using debris as makeshift ramps prior to plaintiff's accident, that he knew that Rite-Way drivers, in the spirit of getting the work done quickly and efficiently, would move the debris-filled containers to the truck, and that he never told plaintiff to stop.

Plaintiff knew nothing about any contract. Covelli, when asked whether there was a written contract or whether it was done by phone, responded: "I think it is done verbally." None of the contracts in the record address the agreement or course of conduct, whether written or oral, whereby Rite-Way would pick up any construction debris when necessary and haul it away. Both witnesses testified that plaintiff was there simply to pick up garbage ("Q. They [Rite-Way] had no employees who actually worked inside the building do [sic] any demolition or other work? A. [Covelli]. No, sir"). As noted above, 660 First Avenue was only one of a number of locations at which plaintiff was scheduled to make pickups that day.

As to HRH's control and supervision of plaintiff's work, the majority is aware that the sole basis for the motion court's finding that there was a question of fact as to defendants' control over plaintiff's work was that "the foreman [Covelli] testified that when plaintiff assisted in moving the carts the foreman did not stop him from doing so." The majority does not adopt this questionable rationale, which relies upon a double negative, since it is also aware that both plaintiff and Covelli consistently testified that Covelli never supervised plaintiff's work in any way. Nevertheless, the majority would still find that Covelli's testimony that in the past plaintiff sometimes helped HRH employees move the containers to the truck (with HRH's implicit acquiescence), because "basically we're trying to help each other," when coupled with his statement that it was HRH's responsibility to move the containers to the street, creates an issue of fact as to control and notice. This conclusion totally misses the point regarding control and supervision. To impose liability on an owner or general contractor under Labor Law § 200, there must be a showing that the owner or general contractor directly oversaw or controlled the actual work in

which plaintiff was engaged at the time of his injury (*see DeSimone v Structure Tone*, 306 AD2d 90, 91 [2003]; *Hughes v Tishman Constr. Corp.*, 40 AD3d 305, 306 [2007]). Clearly, even if there were a question of past supervision, which there is not, there is no such showing with regard to plaintiff's activities on the day of the accident. Finally, inasmuch as neither plaintiff nor the majority mentions his claim of common-law negligence, I assume that they agree that there is no evidence supporting that claim. Thus, defendants should have been granted summary judgment dismissing plaintiff's Labor Law § 200 and common-law negligence claims.

Accordingly, for all the foregoing reasons, summary judgment should be granted and the complaint dismissed in its entirety against all defendants.